IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RENTRAK CORPORATION, a professional
corporation,

        Plaintiff,

      v.

SIMON BURTON, an individual, JOEL
HEDRICK, an individual, VISTA GROUP
INTERNATIONAL LIMITED, a New Zealand
limited company, and NUMERO LIMITED,
a New Zealand limited company,

        Defendants.
_____

SIMON BURTON, an individual,

        Counterclaimant,

      v.

RENTRAK CORPORATION, a professional
corporation,

        Counterdefendant.
_____

Case No. 3:15-cv-00458-SB

**FINDINGS AND
RECOMMENDATION**

BECKERMAN, **Magistrate Judge.**

Rentrak Corporation ("Rentrak") filed this action against Vista Group International Limited ("Vista Group"), Numero Limited ("Numero"), Joel Hedrick ("Hedrick"), and Simon Burton ("Burton") (collectively, "Defendants"), alleging, among other things, that Vista Group, Hedrick, and Burton engaged in a scheme to steal Rentrak's intellectual property for purposes of developing their own competing venture, which is now operating as Numero. Burton filed counterclaims against Rentrak for constructive discharge and slander *per se*. Vista Group, Numero, and Hedrick now move to dismiss Rentrak's complaint for lack of personal jurisdiction, and Rentrak moves to dismiss Burton's constructive discharge counterclaim for failure to state a claim upon which relief may be granted. Vista Group, Numero, and Hedrick have also jointly moved to strike portions of declarations filed by Rentrak in opposition to their motions to dismiss. For the reasons explained below, the Court recommends that the district judge grant Vista Group and Numero's motion to dismiss (ECF No. 6), grant Hedrick's motion to dismiss (ECF No. 12), deny as moot Vista Group, Numero, and Hedrick's joint motion to strike (ECF No. 47), and deny Rentrak's motion to dismiss (ECF No. 27).

## FACTUAL AND PROCEDURAL HISTORY

Rentrak is an Oregon corporation that provides audience measurement and analytic services to the advertising, film, and television industries. (Compl. ¶¶ 2, 13.) Rentrak has developed a number of proprietary and confidential systems that facilitate the collection and dissemination of data related to audience measurement and analytics. (Compl. ¶¶ 16, 18.) One of those systems is a web-based platform known as Box Office Essentials. (Pitzer Decl. ¶ 3; Compl. ¶ 18.) Box Office Essentials ingests audience measurement data from exhibitors (i.e., movie theaters) around the world, and then

makes that data available in customizable reports to clients or "subscribers" in the film industry (i.e., movie production companies and distributors) through the Box Office Essentials website. (Pitzer Decl. ¶ 3; Compl. ¶¶ 17-18.)

Rentrak's global headquarters is located in Portland, Oregon, which is where the majority of Rentrak's senior corporate management reside, as well as all of its human resources, finance, and technology-related personnel. (Giambra Decl. ¶ 4; Peachey Decl. ¶ 2; Ilg Decl. ¶ 4.) In addition to Rentrak's global headquarters in Oregon, Rentrak maintains offices in California, New York, Florida, and ten foreign countries. (Giambra Decl. ¶¶ 5-6; Ilg Decl. ¶ 4.) However, Rentrak operates through a variety of "local legal entities" both domestically and abroad, because some of Rentrak's employees "provide services that require a greater degree of proximity to the regional markets they serve." (Peachey Decl. ¶ 4; Ilg Decl. ¶ 4.) In the Asia-Pacific region, for example, Rentrak operates through Rentrak Australia Pty., Ltd. ("Rentrak Australia"), whose office is located in Sydney, Australia. (Peachey Decl. ¶ 5; Hedrick Decl. ¶ 12.)

In mid-December 2009, Rentrak and The Nielsen Company (US), Inc. ("The Nielsen Company"), a Delaware limited liability company, entered into a global agreement under which Rentrak agreed to acquire the Nielsen Electronic Data Interchange ("Nielsen EDI" or "EDI") business.[1] (*See* Ilg Decl. ¶ 11; Hedrick Decl. Ex. 1, at 1; Answer & Countercls. at 42.) Rentrak officially completed its acquisition of Nielsen EDI and its data file specification during the first quarter of 2010. (*See* Ilg Decl. ¶ 11; Brenner Decl. Ex. A, at 1.) Like Rentrak, Nielsen EDI also collected and processed audience behavior data for movie production companies and distributors,

---

[1] EDI "is the transfer and exchange of business data from one computer system to another using a standard digital format." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 277 (4th Cir. 2012).

and it utilized one of the most oft-used data file specifications in the film industry. (*See* Holdaway Decl. ¶ 3; Second Cadzow Decl. ¶¶ 4-6, ECF No. 50.) A proprietary data file specification, such as the Nielsen EDI specification and the "eGro"/"Ebor" specification developed by Rentrak, provides an exhibitor with a blueprint on how to send its raw box office data to the analytics company that processes the data. (Second Cadzow Decl. ¶ 5; Compl. ¶¶ 18, 24.) Rentrak considers its data file specifications (e.g., the Nielsen EDI and "eGro"/"Ebor" specifications) to be valuable trade secrets, because they allow Rentrak to provide "better and easier-to-use" audience behavior data to clients, who are then able to optimize their programming and advertising revenue by sending more targeted messages to consumers. (*See* Pitzer Decl. ¶ 11; Brenner Decl. Ex. A, at 1; Compl. ¶ 20.) Rentrak only shares its data file specifications "with exhibitors subject to confidentiality and non-disclosure requirements." (Pitzer Decl. ¶ 9.)

Burton, a citizen of Australia and employee of The Nielsen Company Australia Pty., Ltd. ("Nielsen Australia"), joined Rentrak as part of Rentrak's acquisition of Nielsen EDI.[2] (Compl. ¶ 26; Answer & Countercls. at 42.) Burton entered into an employment agreement with Rentrak in late January 2010, which included confidentiality, noncompetition, and Oregon choice-of-law and forum-selection provisions. (Compl. Ex. A, at 1-2.) Rentrak made Burton a managing director of Rentrak International when he joined the company. (Compl. ¶ 26.) His title later changed to Vice President of Rentrak International in Rentrak's Theatrical International Division. (Compl. ¶ 26.) Burton "worked out of Rentrak's Los Angeles office, which is the headquarters of Rentrak's International Theatrical Division." (Burton Decl. ¶ 1.)

---

[2] For the sake of brevity and clarity, the allegations that form the basis of Burton's constructive discharge counterclaim will be discussed in conjunction with the analysis of Rentrak's motion to dismiss.

Also in early 2010, Rentrak Australia acquired the Australian EDI box office business from Nielsen Australia, as contemplated by the global agreement between Rentrak and The Nielsen Company. (Hedrick Decl. ¶¶ 11, 13; *id*. Ex. 1, at 1.) Hedrick, an Australian citizen and employee of Nielsen Australia, joined Rentrak Australia when it acquired the Australian EDI box office business. (Hedrick Decl. ¶ 2; *id*. Ex. 1, at 2.) The employment transfer agreement signed by Hedrick and representatives from Rentrak Australia and Nielsen Australia provided, in relevant part: "Rentrak Australia hereby confirms [that] . . . the contractual terms and conditions of your current employment contract will be maintained in all respects, and that all rights and benefits owing to you . . . will be . . . honored by Rentrak Australia as of the date the EDI business in Australia is transferred to Rentrak Australia."[3] (Hedrick Decl. Ex. 1, at 2.) Hedrick also submitted a "click-through" agreement, in which the computer user is prompted to click on an "I agree" box after being presented with the terms and conditions of Rentrak's Code of Business Conduct ("COC"). (Compl. Ex. C, at 1; Hedrick Decl. ¶ 14.) The COC makes clear that it is merely "a statement of policies for business conduct and does not, in any way, constitute an employment contract or an assurance of continued employment." (Compl. Ex. C, at 2.)

Although Hedrick was an employee of Rentrak Australia, Rentrak's COC "applies to all Rentrak employees, irrespective of which Rentrak operating company technically employs an individual employee." (Ilg Decl. ¶¶ 8, 10.) Rentrak's COC states that employees "must avoid any activity or personal interest that creates or appears to create a conflict between [their] interests and the interests of the Company[,]" such as "market[ing] products in competition with the Company's

---

[3] Nielsen Australia had previously sent Hedrick a confidentiality and proprietary rights agreement, but Hedrick does not recall signing that agreement. (Hedrick Decl. ¶ 14; *cf*. Compl. Ex. B, at 2.)

current or potential business activities." (Compl. Ex. C, at 7-8.) Rentrak's COC also states that employees have a "duty to respect and protect the confidentiality" of Rentrak's proprietary information, which "is defined as information that was developed, created, or discovered by, or on behalf of, Rentrak or that became known by, or was conveyed to, the [C]ompany that has not been publicly disclosed." (Compl. Ex. C, at 11.) Examples of Rentrak's proprietary information include, "but is not limited to trade secrets, copyrights [i.e., the Nielsen EDI and 'eGro'/'Ebor' data file specifications, which are subject to copyright protection], ideas, techniques, know-how, inventions . . . and any information of any type relating to marketing, pricing, customers, . . . and financial condition or results of other financial data." (Compl. Ex. C, at 11; Brenner Decl. Ex. A, at 1.)

Hedrick worked exclusively in Sydney, Australia, while employed by Rentrak Australia. (Hedrick Decl. ¶ 15.) Hedrick received his compensation from Rentrak Australia, and he paid taxes to the Australian government. (Hedrick Decl. ¶ 16; *id*. Ex. 2, at 1.) Hedrick traveled to Oregon to attend orientation meetings at Rentrak's global headquarters on or about January 18, 2010, through January 21, 2010, shortly before his employment with Rentrak Australia commenced. (Hedrick Decl. ¶ 18.) Hedrick's only other visit to Oregon occurred in January 2011, "for a global Rentrak corporate sales meeting that lasted only a few days." (Hedrick Decl. ¶ 19.)

Hedrick also communicated with employees from Rentrak's global headquarters in Oregon, because, "[d]espite the existence of local entities in various countries around the globe, Rentrak has always [functionally] operated as one company." (Peachey Decl. ¶ 5; Ilg Decl. ¶ 5; Giambra Decl. ¶ 4.) For example, Hedrick communicated directly with Rentrak's director of financial systems and reporting, Barbara Peachey, regarding the payroll for the Asia-Pacific office, the transfer of operating

funds from Rentrak to Rentrak Australia, outstanding accounts receivable, and the transmission of forms that needed to be executed by senior Rentrak executives and filed on an annual basis with the Australian Securities and Investment Commission. (Peachey Decl. ¶¶ 7, 9, 12-13.) Hedrick also communicated with Rentrak's human resources department, including Rentrak's senior vice president of human resources, Gloria Ilg, regarding questions and issues pertaining to his benefits and compensation packages. (Ilg Decl. ¶ 14.) Furthermore, Hedrick would comment on "tickets" (electronic conversations about technological problems concerning data file specifications or Box Office Essentials, which stemmed from reports made by exhibitors), that were transmitted to, and handled by, Rentrak's Oregon-based information technology personnel. (Pitzer Decl. ¶ 7.)

By January 2013, while still employed by Rentrak Australia and Rentrak, respectively, Hedrick and Burton were in communication with Kirk Senior ("Senior") regarding the development of a business ("Vi-Box," or, as it was later called, "Numero") that would compete with Rentrak. (Compl. ¶¶ 48-49, 66, 74; Myers Decl. Ex. A, at 4, ECF No. 60-1.)[4] Burton, Hedrick, and Senior planned to target clients that already had deals in place with Rentrak, use Burton and Hedrick's existing Rentrak relationships to meet with exhibitors and subscribers, and capitalize on the fact that certain domestic exhibitors would be willing to report to another analytics company. (Compl. ¶¶ 48-49, 66, 74; Myers Decl. Ex. A, at 4, ECF No. 60-1.) Senior currently serves as the director and

---

[4] In support of its opposition to Vista Group, Numero, and Hedrick's motions to dismiss, Rentrak filed supplemental declarations, including the declaration of Timothy Myers, after the deadline for briefing on the Rule 12(b)(2) motions. Vista Group's counsel objected to all of Rentrak's late-filed declarations. *See* LR 7-1(e)(3). The Court overrules Vista Group's objection, because the information set forth in Rentrak's untimely declarations did not impact the Court's recommendation on the Rule 12(b)(2) motions to dismiss. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002) (explaining that the "district court has considerable latitude in managing the parties' motion practice and enforcing local rules").

chairman of Defendant Vista Group, a New Zealand limited company, and in 2013, Senior served as the executive chairman of Vista Entertainment Solutions Limited ("Vista Entertainment"), "a separate New Zealand corporate entity" and wholly owned subsidiary of Vista Group. (Senior Decl. ¶ 1; Sandvig Decl. Ex. 9, at 10; Holdaway Decl. ¶¶ 2, 4; Myers Decl. Ex. A, at 1; Defs.' Reply Br. at 2.)

Vista Group was incorporated in New Zealand on August 6, 2003, and it currently "has a portfolio of six businesses that provide software solutions to the film industry." (Sandvig Decl. Ex. 4, at 1; *id*. Ex. 9, at 4, 36, 38.) The six businesses that comprise Vista Group are: (1) Veezi and Vista Cinema or "Vista," both of which are owned by Vista Group's subsidiary, Vista Entertainment; (2) BookMyShow; (3) MACCS International; (4) Movio Limited ("Movio"); and (5) Numero, a New Zealand limited company whose shares were transferred from Vista Entertainment to, among others, Vista Group and Hedrick. (Sandvig Decl. Ex. 9, at 5-9, 26, 36-37, 40, 42; *id*. Ex. 20, at 1-2; Cadzow Decl. ¶ 2.) There is also a business entity under the Vista Group umbrella called Vista Entertainment Solutions (USA), Inc. ("Vista USA"), which is based out of Los Angeles, California. (Sandvig Decl. Ex. 14, at 1.) Vista Group refers to Vista USA as Vista Entertainment's "USA office." (Sandvig Decl. Ex. 9, at 48.) Vista USA's president, Derek Forbes, serves on the Vista Group executive team, along with Murray Holdaway ("Holdaway"), a co-founder and chief executive of Vista Group and director Vista Entertainment, and Brian Cadzow ("Cadzow"), a co-founder and executive director of Vista Group and director of Numero. (Sandvig Decl. Ex. 9, at 46, 48; Holdaway Decl. ¶ 1; Cadzow Decl. ¶ 1; Johnson Decl. ¶ 10.)

In mid-February 2013, Vista Entertainment and Rentrak entered into a collaboration agreement.[5] (Pitzer ¶ 14; *id*. Ex. 1, at 1-6.) Vista Entertainment is a supplier of cinema ticketing systems, and it has "many customers" that interface with Rentrak for purposes of reporting box office data. (Pitzer Decl. Ex. 1, at 1.) Unaware of Hedrick and Burton's discussions with Senior, Rentrak began providing certain confidential information to Vista Entertainment in late April 2013, pursuant to the collaboration agreement. (Pitzer Decl. ¶ 15.)

The following month, on May 18, 2013, Burton informed Rentrak that he was leaving the company. (Compl. ¶ 45.) In response to concerns about Burton's activities after leaving the company, Rentrak had a forensic analysis performed on the laptop Burton used during the course of his employment. (Johnson Decl. ¶ 6.) The forensic analysis revealed the discussions that had been taking place between Burton and Senior regarding the formation of a company that would compete with Rentrak. (Johnson Decl. ¶¶ 6-9.) The forensic analysis also revealed that: (1) Burton sent Senior financial models for Vi-Box, including projections of revenue for exhibitors and film studios in Australia and New Zealand, (2) Burton and Hedrick planned to serve as Vi-Box's chief executive officer and operating officer, respectively, (3) Burton was optimistic that they could "move the U.S. Business ahead of target," (4) there were discussions about Hedrick's father providing financial support for the Vi-Box business, and (5) Senior planned to discuss Hedrick and Burton's Vi-Box proposition with Holdaway and Cadzow. (Johnson Decl. ¶¶ 6-10; Myers Decl. ¶¶ 8-14; *id*. Ex. A, at 1-6.)

---

[5] The collaboration agreement and its terms are not at issue in this litigation. (Pl.'s Mot. Leave File Opp'n Br. & Decl. Under Seal at 5, ECF No. 19.) The Court discusses the collaboration agreement here, with due care not to disclose its confidential terms, because, as discussed below, Rentrak relies on the collaboration agreement in opposing Vista Group, Numero, and Hedrick's motions to dismiss.

Less than a month later, on June 2, 2013, Hedrick emailed his resignation letter to the president of Rentrak's worldwide theatrical division and global movie services, Ronald Giambra ("Giambra"). (Ilg Decl. ¶ 15.) Hedrick's letter was later forwarded to Rentrak's human resources department. (Ilg Decl. ¶ 15.) Immediately after leaving Rentrak, Hedrick and Burton provided consulting services to Vista Group's subsidiary, Movio. (Second Hedrick Decl. ¶ 1, ECF No. 53; Johnson Decl. Ex. 3, at 1.) Movio is a New Zealand limited company that provides marketing data analysis to cinema exhibitors and distributors but not "high level data" on box office admissions and revenue like Numero. (Sandvig Decl. Ex. 3, at 1-2; *id.* Ex. 9, at 7.) Movio's directors are Senior and Cadzow. (Sandvig Decl. Ex. 3, at 1-2.) Hedrick and Burton subsequently collaborated with Vista Group to form Numero. (Second Hedrick Decl. ¶ 2.) In an initial public offering ("IPO") of ordinary shares, Vista Group referred to Numero as "a new venture into a market that [was] dominated by a single company, Rentrak Corporation[,]" which meant that there was "an opportunity in the market for an alternative provider that provides a faster and more modern service." (Sandvig Decl. ¶ 9; *id.* Ex. 9, at 9.) Vista Group's IPO further added that Numero "intends to expand internationally from 2015 onwards." (Sandvig Decl. Ex. 9, at 45.)

Numero was incorporated in New Zealand on October 18, 2013. (Sandvig Decl. Ex. 8, at 1.) Soon thereafter, Giambra learned that Numero was using Rentrak's historical data during customer demonstrations. (Giambra Decl. ¶ 9.) As a part of their efforts to develop Numero's aggregated box office reporting platform business and compete with Rentrak, Hedrick and Burton also attempted to use confidential information and trade secrets they obtained during the course of their employment, including, but not limited to, Rentrak's proprietary data file specifications, pricing strategies, and contract terms. (*See* Compl. ¶ 65; Johnson Decl. ¶¶ 6-10; *id.* Ex. 1, at 1-2; *id.* Ex. 2,

at 1-2; Brenner Decl. Ex. A, at 1-2.) For example, while acting in his capacity as a representative of Numero, Burton met with the managing director of Reading Cinemas' Australia and New Zealand divisions, Wayne Smith ("Smith"), about having their theaters electronically report box office data to Numero. (Smith Decl. ¶¶ 1, 4-5, ECF No. 63.) Smith later discovered that Hedrick sought to enable the Nielsen EDI data file specification (i.e., the same data file specification Reading Cinemas uses to report box office data to Rentrak), in order to facilitate the electronic feed to Numero. (Smith Decl. ¶ 7.) Kevin Rispin, an information technology manager for Reading Cinemas whose duties "include helping to set up the electronic reporting of box office data from individual movie theaters to companies that collect and aggregate data," confirmed that he understood a March 1, 2015, email from Hedrick "to mean that Numero wanted Reading [Cinemas] to report data to Numero in the same manner that [they] report this data to Rentrak in the United States." (Rispin Decl. ¶¶ 1-2, 5, ECF No. 62.)

Rentrak filed the present action against Defendants on March 19, 2015, alleging claims for breach of contract, intentional interference with economic relations, breach of fiduciary duty and the common law duty of loyalty, breach of the implied covenant of good faith and fair dealing, misappropriation of trade secrets in violation of the Oregon Uniform Trade Secrets Act ("OUTSA"), OR. REV. STAT. §§ 646.461-646.475, violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and violation of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2711. Rentrak, Vista Group, Numero, and Hedrick's motions to dismiss followed and were taken under advisement on July 23, 2015, along with Vista Group, Numero, and Hedrick's joint motion to strike portions of declarations filed by Rentrak in opposition to the Rule 12(b)(2) motions to dismiss.

## LEGAL STANDARDS

### A.     Lack of Personal Jurisdiction

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff

bears the burden of establishing that jurisdiction is proper." *CollegeSource, Inc. v. AcademyOne,*

*Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (citing *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th

Cir. 2008)). "Where, as here, the defendant's motion is based on written materials rather than an

evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts to

withstand the motion to dismiss.'" *Id.* (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606

F.3d 1124, 1127 (9th Cir. 2010)). "Although the plaintiff cannot simply rest on the bare allegations

of its complaint, uncontroverted allegations in the complaint must be taken as true[,] [and] [c]onflicts

between parties over statements contained in affidavits must be resolved in the plaintiff's favor."

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal citations and

quotation marks omitted).[6]

### B.     Failure to State a Claim

The Ninth Circuit has "held that dismissal for failure to state a claim is 'proper only where

there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable

legal theory.'" *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010)

(quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). In evaluating the sufficiency of a

---

[6] Unlike Vista Group, Numero, and Hedrick, who filed motions to dismiss in lieu of an answer, Burton answered Rentrak's complaint on May 15, 2015. Burton disputed the vast majority of Rentrak's factual allegations. For purposes of resolving the Rule 12(b)(2) motions to dismiss, however, Rentrak's factual allegations must be, and therefore are, taken as true to the extent they are uncontroverted by Vista Group, Numero, or Hedrick's affidavits. *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) ("The allegations in the complaint must be taken as true to the extent they are uncontroverted by the [moving] defendant's affidavits.").

complaint's factual allegations, courts must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted). Courts "are not, however, required to accept as true allegations that contradict exhibits attached to the complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id*. Nor are courts required to accept as true allegations that simply recite the elements of a cause of action in a formulaic manner. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Ultimately, surviving a motion to dismiss requires that the complaint "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id*.

## DISCUSSION

### A.      Hedrick, Vista Group, and Numero's Motions to Dismiss

Hedrick, Vista Group, and Numero have moved to dismiss Rentrak's complaint for lack of personal jurisdiction. *See* FED. R. CIV. P. 12(b)(2). "Personal jurisdiction over each defendant must be analyzed separately." *Harris Rutsky & Co Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003); *Brainerd v. Governors of the Univ. of Alta.*, 873 F.2d 1257, 1258 (9th Cir. 1989) ("Personal jurisdiction over each defendant must be analyzed individually."). Accordingly, the Court will individually consider whether personal jurisdiction may be exercised over Hedrick, Vista Group, and Numero.

### 1.    Constitutional Personal Jurisdiction Standards

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over [defendants]." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014)). Oregon law authorizes personal jurisdiction over defendants to the full extent permitted by the United States Constitution. *See* Or. R. Civ. P. 4 L; *Gray & Co. v. Firstenberg Mach. Co., Inc.*, 913 F.2d 758, 760 (9th Cir. 1990) ("Oregon's long-arm statute confers jurisdiction to the extent permitted by due process."). The Court must therefore inquire whether its exercise of jurisdiction over Hedrick, Vista Group, and Numero "comports with the limits imposed by federal due process." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Daimler*, 134 S. Ct. at 753).

"Due process requires that the defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.''" *Picot*, 780 F.3d at 1211 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction." *Ranza*, 793 F.3d at 1068. Specific jurisdiction is sometimes referred to as "case-specific" or "case-linked" jurisdiction, meaning it depends on an affiliation between the forum state and the underlying controversy, whereas general jurisdiction is sometimes referred to as "all-purpose" jurisdiction, meaning the court may assert jurisdiction over a defendant based on a forum connection unrelated to the underlying lawsuit (e.g., domicile, place of incorporation, or principal place of business). *Walden v. Fiore*, 134 S. Ct. 1115, 1121 n.6 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011). Rentrak does not contend that Vista Group, Numero, and Hedrick are subject to general

jurisdiction in Oregon; instead, Rentrak argues that specific jurisdiction exists over each of these defendants.

The Ninth Circuit employs the following three-prong test to determine if a defendant has sufficient minimum contacts to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must *purposefully direct* his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he *purposefully avails* himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Picot*, 780 F.3d at 1211 (emphasis added) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden of satisfying the first two prongs. *CollegeSource*, 653 F.3d at 1076. If the plaintiff does so, the burden then shifts to the moving defendant to present "a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

"The exact form of [a court's] jurisdictional inquiry depends on the nature of the claim at issue." *Picot*, 780 F.3d at 1212. For claims sounding in contract, courts in this circuit "generally apply a 'purposeful availment' analysis and ask whether a defendant has 'purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Schwarzenegger*, 374 F.3d at 802). For claims sounding in tort, courts in this circuit "instead apply a 'purposeful direction' test and look to evidence that the defendant has directed his actions at the forum state, even if those actions took place elsewhere." *Id.*

Rentrak asserts both contract and tort claims against Hedrick, but asserts only tort claims against Vista Group and Numero. Accordingly, Hedrick's motion to dismiss implicates both the purposeful direction and purposeful availment tests, but Vista Group and Numero's motion to dismiss implicates only the purposeful direction test.

### 2.    Specific Personal Jurisdiction over Hedrick

#### a.    Prong One: Purposeful Direction (Tort Claims)

In analyzing whether the Court has specific personal jurisdiction over the tort claims Rentrak brings against Hedrick, the Court must apply the Ninth Circuit's three-part "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984). *See Picot*, 780 F.3d at 1213-14. Under the *Calder* effects test, "a defendant purposefully directed his activities at the forum if he: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Id.* at 1214 (citation omitted). In applying this effects test, the Court "must 'look[ ] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.* (quoting *Walden*, 134 S. Ct. at 1122). Therefore, "a mere injury to a forum resident is not a sufficient connection to the forum. Rather, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* (citation and quotation marks omitted).

##### i.    Intentional Act

The term "intentional act" means "the defendant must act with the 'intent to perform an actual, physical act in the real world.'" *Id.* (quoting *Schwarzenegger*, 374 F.3d at 806). The Court finds that Hedrick committed an intentional act.

In *Picot*, the defendant, Dean Weston, a resident of Michigan, challenged whether the United States District Court for the Northern District of California could assert personal jurisdiction over him. *See id*. at 1210-11. Tracy Coats, a resident of Ohio and the majority owner of a Delaware corporation, had met with Weston on a few occasions at the University of Michigan to discuss a technology Weston developed with Bernard Picot, a resident of California. *Id*. at 1209-10. Picot eventually agreed to sell the technology to Coats' company. *Id*. at 1210. After Weston threatened to sue if he did not receive his share of the proceeds pursuant to an oral profit-sharing agreement, Picot filed a declaratory judgment action that was later removed to the Northern District of California. *Id*. at 1210-11. On appeal, the Ninth Circuit concluded that the first prong of the *Calder* effects test was satisfied, because "Weston committed an intentional act when he spoke with Coats about the technology." *Id*. at 1214.

Similarly here, Hedrick committed an intentional act when he began collaborating with Burton and Senior regarding the formation of a business that would compete with Rentrak. Accordingly, the Court concludes that the first prong of the effects test, the commission of an "intentional act," is satisfied.

## ii. Express Aiming

The second part of the *Calder* effects test asks whether the defendant's tortious conduct was expressly aimed at the forum state. *Brayton*, 606 F.3d at 1129. The exact form of the Court's "analysis varies from case to case and 'depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue.'" *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger*, 374 F.3d at 807). In this case, Rentrak alleges that Hedrick intentionally interfered with Rentrak's business and contractual relationships, including the employment agreement entered into by Rentrak and

Burton, so the Court must ask whether Hedrick expressly aimed such interference at Oregon. *See, e.g., Picot*, 780 F.3d at 1214 ("Picot alleges intentional interference with a contract, so we must ask whether Weston expressly aimed such interference at California").

Rentrak argues that this requirement is met because Hedrick committed intentional acts directed at Rentrak in Oregon. (Pl.'s Consol. Opp'n at 17.) In assessing Rentrak's argument, the Court is guided by the Ninth Circuit's recent decision in *Picot*. In *Picot*, the Ninth Circuit held that Weston did not expressly aim his conduct at California. *Id*. at 1215. In reaching this conclusion, the Ninth Circuit reiterated the traditional understanding that a court's personal jurisdiction analysis must focus on the defendant's contacts with the forum state, not the defendant's contacts with a resident of the forum state:

> Weston's allegedly tortious conduct consists of making statements to Coats (an Ohio resident) that caused [Coats' company] (a Delaware corporation with offices in Ohio) to cease making payments into two trusts (in Wyoming and Australia). Weston did all this from his residence in Michigan, without entering California, contacting any person in California, or otherwise reaching out to California. In short, none of Weston's challenged conduct had anything to do with [the State of] California itself. Moreover, . . . Picot's injury, an inability to access out-of-state funds, is not tethered to California in any meaningful way. Rather, his injury is entirely personal to him and would follow him wherever he might choose to live or travel. The effects of Weston's actions are therefore not connected to the forum State in a way that makes those effects a proper basis for jurisdiction.

*Id*. (citation, quotation marks, brackets, and footnote omitted). In light of the foregoing, the Ninth Circuit held that "Picot ha[d] failed to make a prima facie showing of specific personal jurisdiction over Weston on his [tort] claim." *Id*.

The Court is also guided by a recent decision in this district. In *Paragon Bioteck, Inc. v. Altaire Pharmaceuticals, Inc.*, No. 3:15-cv-00189-PK, 2015 WL 4253996 (D. Or. July 10, 2015), the plaintiff, a Nevada corporation with its principal place of business in Oregon, entered into a

business agreement with one of the named defendants, an entity based in and organized under the laws of New York. *Id*. at *1-2. The agreement provided the defendant with the exclusive right to manufacture two of the plaintiff's products. *Id*. at *2. Before the Food and Drug Administration ("FDA") could remove a range of similar unapproved products from the market, the FDA needed assurances from the plaintiff and defendant regarding their ability and willingness to offset the reduction in supply. *Id*. at *3. After providing the FDA with the assurances it requested, the defendant took actions that allegedly halted production and interfered with the plaintiff's ability to comply with its obligations to the FDA, as well as another party with which the plaintiff had contracted, Bausch & Lomb. *Id*. at *4. The plaintiff filed a declaratory judgment action, and the defendant moved to dismiss for lack of specific personal jurisdiction. *Id*. at *4-5. The *Paragon* court concluded that the plaintiff failed to show that the court could properly exercise specific personal jurisdiction over the defendant based on the plaintiff's claims for tortious interference with contractual relations. *Id*. at *8. Guided largely by the Supreme Court's decision in *Walden* and the Ninth Circuit's decision in *Picot*, the *Paragon* court reasoned as follows:

> [The defendant]'s allegedly tortious conduct consists of interfering with [the plaintiff]'s relationship with another out-of-state entity; placing a 'credit hold' on [the plaintiff]'s account; and refusing to fulfill normal obligations at its principal place of business in New York. [The plaintiff]'s injury, in the form of damages related to its dealings with Bausch & Lomb and the FDA, is not tethered to Oregon in any meaningful way beyond the fact that [the plaintiff]'s principal place of business is in Oregon. Given [the plaintiff]'s state of incorporation, Nevada, the injury itself can be said to be fluid between Oregon and Nevada. *Further, wherever [the plaintiff] may go, its relationship with Bausch & Lomb will be affected by [the defendant]'s alleged actions just the same.* The Ninth Circuit in *Picot* upheld a district court's decision to dismiss for lack of personal jurisdiction based on nearly identical grounds as those at issue in this case.

*Id*. (emphasis added) (citing *Picot*, 780 F.3d at 1215).

Consistent with *Picot* and *Paragon*, the Court concludes that the effects of Hedrick's actions are not connected to Oregon in a way that makes those effects a proper basis for jurisdiction. According to Rentrak, the allegedly tortious conduct committed by Hedrick (an Australian citizen employed by Rentrak's foreign subsidiary, Rentrak Australia) consists of: (1) working with Burton (an Australian citizen who worked out of Rentrak's Los Angeles office) to create and distribute a series of documents to pitch the creation of the company that eventually became Numero (a New Zealand limited company), (2) helping Burton create proposed budgets and extrapolate expected revenues to obtain investor funding for the new venture, (3) encouraging and personally helping Burton to pitch this proposed venture to potential investors and partners (none of whom is alleged to be a citizen of Oregon), (4) intending to harm Rentrak (an Oregon corporation) by misappropriating information and using existing Rentrak relationships, and (5) allegedly being aware that he was interfering with Burton's contract, which had Oregon choice-of-law and forum-selection clauses. (Pl.'s Consol. Opp'n at 17-18.) Rentrak fails to give due consideration to the fact that Hedrick did all of the above activities without entering Oregon, contacting any person in Oregon, or otherwise reaching out to Oregon.

Rentrak also places undue emphasis on Hedrick's two trips to Oregon (i.e., one trip to attend an orientation related to his employment with Rentrak Australia, and the other to attend a global corporate sales meeting), and his benign communications with employees from Rentrak's global headquarters. Crucially, not just any contacts with the State of Oregon will satisfy the test: "[f]or a State to exercise [specific] jurisdiction consistent with due process, the defendant's *suit-related conduct* must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121 (emphasis added). The contacts relied upon by Rentrak were not suit-related. The "mere fact that

[defendant's] conduct affected [a] plaintiff[] with connections to the forum State does not suffice to authorize jurisdiction." *Id*. The record is quite clear that Hedrick's suit-related conduct did not create a substantial connection with Oregon. Rather, Hedrick's suit-related conduct merely affected a plaintiff with connections to Oregon, which does not suffice to authorize specific personal jurisdiction. Furthermore, to the extent Rentrak attempts to tether its injury to Oregon by arguing that it is not transitory and cannot easily move from state to state, the Court notes that "wherever [Rentrak] may go, its relationship with [its clients and Burton] will be affected by [Hedrick]'s alleged actions just the same." *Paragon*, 2015 WL 4253996, at *8. Accordingly, the effects of Hedrick's actions are not connected to Oregon in a way that makes those effects a proper basis for jurisdiction. *See Picot*, 780 F.3d at 1215.

### iii.     Foreseeable Harm

The Court need not address the third prong of the *Calder* effects test because Rentrak has failed to satisfy the express aiming requirement. *See Idaho Energy, LP. v. Harris Contracting Co.*, No. 07–CV-423, 2008 WL 4498809, at *8 (D. Idaho Sept. 30, 2008) ("Plaintiff has failed to carry its burden on [the second] prong of the 'effects test,' so the Court need not address the third prong of the 'effects test.'").

### b.     Prong One: Purposeful Availment (Contract Claims)

Rentrak also brings claims against Hedrick that are dependent on the existence of an underlying contract. "[A] claim dependent on the existence of an underlying contract sounds in contract, as opposed to tort." *Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 625 (9th Cir. 1996). Therefore, the Court's minimum contacts inquiry for Rentrak's contract-dependent claims focuses on whether Hedrick purposefully availed himself of the privilege of conducting business within

Oregon through a contract. *See Picot*, 780 F.3d at 1212 ("[O]ur minimum contacts inquiry for Picot's declaratory judgment claim focuses on whether Weston purposefully availed himself of the privilege of conducting business within California through the purported oral contract.") (internal citation omitted).

"[A] contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto*, 539 F.3d at 1017. "Rather, there must be actions by the defendant *himself* that create a substantial connection with the forum State." *Picot*, 780 F.3d at 1212 (citation and quotation marks omitted). That requires something more than mere random, fortuitous, or attenuated contacts. *Id*. In determining whether sufficient contacts exist, a court should consider whether a defendant "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state," *id*. (quoting *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)), as well as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id*. (quoting *Burger King*, 471 U.S. at 479).

In arguing that Hedrick purposefully availed himself of the privilege of conducting business in Oregon, Rentrak relies on a district court case that involved an alleged breach of an employment contract. *See Beverage Mgmt. Sys., Inc. v. Ott*, No. 3:12-cv-2126-SI, 2013 WL 1296083, at *5 (D. Or. Mar. 26, 2013). Rentrak's reliance on *Beverage Management* is unavailing for two reasons. First, Hedrick never entered into an employment agreement (or any other relevant contract) with an Oregon-based corporation; rather, he accepted an offer extended by Rentrak's Australia-based subsidiary. *See generally Walden*, 134 S. Ct. at 1122 (explaining that the defendant's alleged suit-related conduct must create a substantial connection with the forum state, and that the necessary relationship "must arise out of contacts that the 'defendant *himself*' creates with the forum State").

Second, *Beverage Management* pre-dates *Walden* and *Picot*, "two important decisions that have altered the landscape of personal-jurisdiction analysis." *Paragon*, 2015 WL 4253996, at *1 (Simon, J.) (rejecting the plaintiff's heavy reliance on *Beverage Management* for the same reason).

Even if Hedrick was in an ongoing contractual relationship with Rentrak, however, Hedrick's contacts with Oregon are equivalent to, or even fewer than, the contacts that the Ninth Circuit deemed insufficient to support a California federal district court's assertion of specific jurisdiction in *Picot*. The contract claim in *Picot* stemmed from a contractual relationship between Weston (a Michigan resident) and Picot (a California resident). 780 F.3d at 1212-13. The contract was formed in Michigan and Weston performed his duties almost entirely in Michigan, although he corresponded regularly with Picot and twice visited California to further their common enterprise. *Id*. The Ninth Circuit held that Weston's contacts were insufficient to support the assertion of personal jurisdiction in California. *Id*. at 1213. By comparison, in this case, the contract was formed outside of Oregon (the offer of employment was extended by an Australian-based company, and the record suggests that acceptance necessarily occurred while Hedrick was domiciled in New York or Australia), and Hedrick performed his duties almost entirely in Australia. As in *Picot*, Hedrick did correspond with corporate headquarters located in Oregon, and twice traveled to Oregon. Setting aside the fact that the latter contacts bear no meaningful relationship to Hedrick's suit-related conduct, Hedrick's contacts do not surpass the contacts the Ninth Circuit deemed insufficient in *Picot*.

Under these circumstances, the Court concludes that it cannot assert personal jurisdiction over Hedrick. *See Paragon*, 2015 WL 4253996, at *2 (holding the same where the defendants were in an ongoing contractual relationship with the plaintiff, the defendants performed their duties entirely in New York, and the defendants sent documents and made telephone calls to Oregon, but

never entered the state); *Bixby v. KBR, Inc.*, 603 F. App'x 605, 606 (9th Cir. 2015) (affirming dismissal for lack of personal jurisdiction where the plaintiffs were the only link between the defendant and Oregon).

  c.  **Prong Two: Arising out of or Relating to the Forum Activities**

When a plaintiff has failed to satisfy its burden of establishing the first or second prong of the Ninth Circuit's three-prong specific jurisdiction test, the district court's jurisdictional inquiry usually ends. *See Linthicum v. Shenkman*, No. 13-cv-1099, 2013 WL 4875024, at *7 (S.D. Cal. Sept. 10, 2013) ("Plaintiff has failed to satisfy her burden of establishing the first prong of the Ninth Circuit's three-prong specific jurisdiction test. Therefore, 'the jurisdictional inquiry ends.'") (citation omitted); *PSF Indus., Inc. v. Munroe, Inc.*, No. Civ. 05-6089-AA, 2005 WL 1565001, at *3 (D. Or. June 24, 2005) (declining to reach the third prong of the specific jurisdiction test because the plaintiff failed to satisfy the first and second prongs). This Court will continue with its jurisdictional inquiry to provide the district judge and the parties with a more comprehensive analysis.

The second prong of the Ninth Circuit's specific jurisdiction test requires a showing of "but for" causation—that is, a showing that the claims would not have arisen but for Hedrick's contacts with Oregon. *See Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001); *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). Citing *Beverage Management*, Rentrak argues that it has satisfied the second prong of the Ninth Circuit's specific jurisdiction test because, "but-for Hedrick's breach of contract and all [the] moving defendants' tortious interference, Rentrak would not have suffered harm." (Pl.'s Consol. Opp'n at 24.) The Court disagrees.

Contrary to Rentrak's suggestion, "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum." *Walden*, 134 S. Ct. at 1125. Furthermore, Rentrak's

reliance on *Beverage Management* is misplaced. In *Beverage Management*, the court held that the defendant's contacts with Oregon were enough to satisfy the but-for requirement, because his contacts were related to his employment with the plaintiff, which was the subject of the lawsuit. 2013 WL 1296083, at *5. Although Rentrak maintains that it operates as a single company, Rentrak does not dispute that Hedrick was an employee of Rentrak Australia. (Ilg Decl. ¶ 8). Hedrick's employment transfer agreement also makes clear that Rentrak Australia, not Rentrak, agreed to honor the terms and conditions of Hedrick's employment agreement with Nielsen Australia. Clearly, then, *Beverage Management* is distinguishable because Hedrick was not an employee of an Oregon corporation, and because Hedrick had no employment agreement with an Oregon corporation. In light of the foregoing, the Court concludes that Rentrak has also failed to meet its burden with respect to the second prong of the Ninth Circuit's specific jurisdiction test.

### d.      Prong Three: Reasonableness

The third prong of the Ninth Circuit's specific jurisdiction test "requires a finding that assertion of jurisdiction is reasonable," meaning "the court must determine whether the assertion of personal jurisdiction would comport with traditional notions of 'fair play and substantial justice.'" *Unocal Corp.*, 248 F.3d at 925 (quoting *Int'l Shoe Co.*, 326 U.S. at 326). Courts in this circuit consider the following seven factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs;
> (2) the burden on the defendant of defending in the forum; (3) the extent of conflict
> with the sovereignty of the defendant's state; (4) the forum state's interest in
> adjudicating the dispute; (5) the most efficient judicial resolution of the controversy;
> (6) the importance of the forum to the plaintiff's interest in convenient and effective
> relief; and (7) the existence of an alternative forum.

*Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) (quoting *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128-29 (9th Cir. 1995)). "None of the factors is dispositive in itself; instead, [courts] must balance all seven." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993).

### i. Factor One

The Court first considers the extent of Hedrick's purposeful injection into the forum state. As detailed previously, the extent of Hedrick's purposeful injection into Oregon's affairs was minimal: Hedrick visited Oregon on two occasions and he engaged in benign communications with employees who worked out of corporate headquarters located in Oregon. None of the aforementioned contacts bear any meaningful relationship to Hedrick's suit-related conduct. The Court concludes that the first factor weighs in favor of Hedrick.

### ii. Factor Two

The Court next considers the burden on Hedrick of defending in Oregon. According to the Ninth Circuit, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Dole Food*, 303 F.3d at 1115 (citation omitted). Consistent with the foregoing, the Court concludes that factor two favors Hedrick because he lives in Australia, which weighs strongly against jurisdiction.

### iii. Factor Three

Next, the Court must determine the extent to which the exercise of jurisdiction would conflict with the sovereignty of the defendant's state. "Litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty

concerns exist." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988). In *Harris Rutsky*, for example, the Ninth Circuit held that the third factor favored the England-based defendant, and noted that it could presume that the United Kingdom had a particular interest in adjudicating the suit because the disputed conduct took place in London, London-based entities were named defendants, and potential witnesses were based out of London. 328 F.3d at 1133. Similarly, in this case, factor three favors Hedrick because the Court may presume, for present purposes, that Australia has a particular interest in adjudicating this lawsuit, because the dispute arose in Australia, residents of Australia are named defendants, and potential witnesses are based in Australia.

### iv.    Factor Four

Factor four considers Oregon's interest in adjudicating the suit. Rentrak is an Oregon corporation whose corporate headquarters are located in Oregon. Accordingly, the fourth factor weighs in favor of Rentrak. *See id*. ("Here, the plaintiff ASR is a California corporation whose principal place of business is in California. This [fourth] factor therefore weighs in ASR's favor.").

### v.    Factor Five

The Court must also consider which forum could most efficiently resolve this dispute. To make this determination, the Court focuses on the location of the evidence and witnesses. *Caruth*, 59 F.3d at 129. The Court concludes that the fifth factor is neutral because evidence and potential witnesses reside in both Oregon and Australia, and because "this factor is 'no longer weighed heavily given the modern advances in communication and transportation.'" *Harris Rutsky*, 328 F.3d at 1133 (citation omitted).

### vi.  Factor Six

The Court next considers the importance of the forum to Rentrak's interests in convenient and effective relief. If Oregon is not a proper forum, Rentrak would be forced to litigate its claims against Hedrick in Australia, which would present an obvious inconvenience for Rentrak. Accordingly, this factor weighs in favor of Rentrak. However, the Ninth Circuit has previously stated that the sixth factor "is not of paramount importance." *Id.* (citing *Dole Food Co.*, 303 F.3d at 1116, and *Caruth*, 59 F.3d at 129); *Roth v. Garcia Marquez*, 942 F.2d 617, 624 (9th Cir. 1991) ("[N]o doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference.").

### vii.  Factor Seven

Finally, the Court must determine whether an adequate alternative forum exists. "The plaintiff bears the burden of proving the unavailability of an alternative forum," *Harris Rutsky*, 328 F.3d at 1133 (citing *Core-Vent*, 11 F.3d at 1490), and Rentrak has not met that burden here. Rentrak argues that the damages it seeks against Hedrick are "more limited" in Australia. (Pl.'s Consol. Opp'n at 28.) Rentrak does not, however, argue that an alternative forum is unavailable, and for good reason: "[Rentrak concedes that] Australia is likely to have jurisdiction over all of the Defendants[.]" (Pl.'s Consol. Opp'n at 27.) In light of the foregoing, the Court concludes that the seventh factor weighs in Hedrick's favor.

### viii.  The Balance of the Reasonableness Factors

Weighing the above factors, the Court concludes that the assertion of personal jurisdiction over Hedrick would not comport with traditional notions of fair play and substantial justice. The majority of the reasonableness factors weigh in favor of Hedrick, while only a few weigh against

him. Given his minimal contacts with the forum state, it is unreasonable for a court in Oregon to exercise personal jurisdiction over Hedrick.

### 3. Specific Personal Jurisdiction over Vista Group and Numero

Rentrak brings only tort claims against Vista Group and Numero. In analyzing whether the Court has specific personal jurisdiction over those tort claims, the Court must apply the Ninth Circuit's three-part "effects" test derived from *Calder*. *See Picot*, 780 F.3d at 1213-14. As discussed, under the effects test, "a defendant purposefully directed his activities at the forum if he: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Id*. at 1214 (citation omitted).

#### a. Intentional Act

To satisfy the intentional act requirement, "the defendant must act with the 'intent to perform an actual, physical act in the real world.'" *Id*. (quoting *Schwarzenegger*, 374 F.3d at 806). Here, Numero committed an intentional act by allegedly using Rentrak's historical data during customer demonstrations, and Vista Group committed an intentional act when one of its senior executives began collaborating with a Rentrak employee regarding the formation of a competing business. Accordingly, the first part of the *Calder* effects test is satisfied with respect to both Vista Group and Numero.

#### b. Express Aiming

The second part of the *Calder* effects test asks whether the defendant's tortious conduct was expressly aimed at the forum state. *Brayton*, 606 F.3d at 1129. In assessing Rentrak's arguments, the Court is once again guided by the Ninth Circuit's recent decision in *Picot*, as well as the Supreme Court's decision in *Walden*. As explained below, applying the principles of *Picot* and *Walden*, the

Court concludes that Vista Group and Numero's actions did not connect them with Oregon in any way sufficient to support the assertion of specific personal jurisdiction. Accordingly, Rentrak has failed to make a prima facie showing of specific personal jurisdiction over Numero and Vista Group.

Rentrak maintains that Numero and Vista Group "have committed a number of acts that were expressly aimed at interfering with Rentrak's business and contractual relationships so as to cause harm to Rentrak in Oregon." (Pl.'s Consol. Opp'n at 16.) Rentrak provides the following examples: (1) Senior encouraged Burton to misappropriate Rentrak's trade secrets and to breach his contractual and fiduciary obligations to Rentrak, (2) Vista Group encouraged Burton to leave Rentrak and then helped him launch Numero, (3) Vista Group continued to induce and encourage Burton to violate his obligations to Rentrak, in order to benefit Vista Group through its ongoing majority stake in Numero, (4) Vista Entertainment entered into a collaboration agreement with Rentrak, in order to obtain information that would help Numero compete with Rentrak, and (5) Vista Entertainment sent personnel to Oregon for purposes of obtaining information that would help Numero compete with Rentrak. (*See* Pl.'s Consol. Opp'n at 16-17.) Citing cease-and-desist letters sent to Burton and Movio, not Vista Group, Rentrak also proclaims that "Vista and Numero . . . knew they were interfering with Burton's contract, which had choice-of-law and forum-selection clauses pointing to Oregon." (Pl.'s Consol. Opp'n at 18.)

The Court is not persuaded by Rentrak's argument. The effects of Vista Group and Numero's actions are not connected with Oregon in a way that makes those effects a proper basis for specific jurisdiction. As stated previously, "[f]or a State to exercise [specific] jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121. The "mere fact that [defendant's] conduct affected [a] plaintiff[]

with connections to the forum State does not suffice to authorize jurisdiction." *Id*. Contrary to this authority, Rentrak argues that jurisdiction over Vista Group and Numero is proper based on the collaboration agreement Rentrak entered into with Vista Entertainment, as well as subsequent actions taken by Vista Entertainment pursuant to that agreement. Rentrak, however, has already conceded that "the Collaboration Agreement and its terms are not at issue in this litigation." (Pl.'s Mot. Leave File Opp'n Br. & Decl. Under Seal at 5.) Accordingly, Rentrak's reliance on the collaboration agreement as a jurisdictional hook is misplaced.

With respect to the remaining examples cited by Rentrak, the Court notes that Rentrak has not alleged that it suffered any injury as a result of Vista Group or Numero entering Oregon, contacting any person in Oregon, or otherwise reaching out to Oregon. That is significant because "[t]he relation between the defendant and the forum 'must arise out of contacts that the defendant *himself* creates with the forum State." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (citation and quotation marks omitted); *see also id.* at 801 ("Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state."). In addition, Rentrak's injury is not tethered to Oregon in any meaningful way, because "wherever [Rentrak] may go, its relationship with [its clients and Burton] will be affected by [Vista Group and Numero]'s alleged actions just the same." *Paragon*, 2015 WL 4253996, at *8.

In conclusion, the effects of Vista Group and Numero's actions are not connected to Oregon in a way that makes those effects a proper basis for jurisdiction. *See Picot*, 780 F.3d at 1215 (making a similar observation); *see also Bixby*, 603 F. App'x at 606 (affirming dismissal for lack of personal jurisdiction where the plaintiffs were the only link between the defendant and Oregon); *Advanced*

*Tactical*, 751 F.3d at 802 (stating that "after *Walden* there can be no doubt that the plaintiff cannot be the only link between the defendant and the forum," and that "[a]ny decision that implies otherwise can no longer be considered authoritative") (citation and quotation marks omitted). Accordingly, Rentrak has failed to make a prima facie showing of specific personal jurisdiction over Vista Group and Numero.[7]

### 4.     Hedrick, Vista Group, and Numero's Joint Motion to Strike

Hedrick, Vista Group, and Numero jointly move to strike portions of declarations that Rentrak filed in support of its opposition to Hedrick, Vista Group, and Numero's motions to dismiss for lack of personal jurisdiction. The Court recommends that the district judge deny Hedrick, Vista Group, and Numero's joint motion to strike as moot, because the challenged portions of the declarations do not affect this Court's recommendation that Hedrick, Vista Group, and Numero's motions to dismiss should be granted. *See Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1088-89 (D. Or. 2012) ("[A]ny necessary rulings on Kaiser's evidentiary objections should be denied as moot, because the evidence moved against does not change the recommendation that Kaiser's motions . . . should be granted.").

### B.     Rentrak's Motion to Dismiss

Rentrak moves to dismiss with prejudice Burton's counterclaim for constructive discharge, on the ground that it fails to state a claim upon which relief can be granted. This Court concludes that

---

[7] Even if Rentrak had met its burden on the first two prongs of the Ninth Circuit's specific jurisdiction test, the Court would nonetheless conclude that the assertion of personal jurisdiction over Vista Group and Numero would not comport with traditional notions of fair play and substantial justice, for the same reasons described above with respect to Hedrick.

Burton has pled a plausible claim for constructive discharge under California law, and recommends that the district judge deny Rentrak's Rule 12(b)(6) motion to dismiss.

The parties are in agreement that California substantive law governs Burton's constructive discharge claim. To state a claim for constructive discharge under California law, the plaintiff must plausibly allege that "the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Vasquez v. Franklin Mgmt. Real Estate Fund, Inc.*,166 Cal. Rptr. 3d 242, 247 (Cal. Ct. App. 2013) (quoting *Turner v. Anheuser-Busch, Inc.*, 32 Cal. Rptr. 2d 223, 226 (Cal. 1994), *overruled in part on another ground in Romano v. Rockwell Int'l, Inc.*, 59 Cal. Rptr. 2d 20 (Cal. 1996)); *cf. Cronk v. Reckitt Benckiser Pharm., Inc.*, No. 13-3245, 2013 WL 4532036, at *2 (N.D. Cal. Aug. 26, 2013) (citing *Turner* for the same pleading standard). In other words, "the conditions of employment must be such that a reasonable employee would feel resignation was the only option, not simply one rational option of several for dealing with the conditions." *Dayton v. Sears Roebuck & Co.*, No. 2:12-cv-01945, 2015 WL 224775, at *12 (E.D. Cal. Jan. 14, 2015) (citing *Vasquez*, 166 Cal. Rptr. 3d at 247-48).

Rentrak argues that Burton's constructive discharge claim should be dismissed because Burton "fails to cite any specific statutory, constitutional or regulatory provision on which he bases [such a] claim." (Pl.'s Mot. Dismiss at 7.) In support of its argument, Rentrak cites the California Supreme Court's decisions in *Turner* and *Green v. Ralee Engineering Co.*, 78 Cal. Rptr. 2d 16 (Cal. 1998).

In *Turner*, the plaintiff brought suit against his former employer, alleging a claim for constructive wrongful discharge in violation of fundamental public policy. 32 Cal. Rptr. 2d at 231. Specifically, the plaintiff alleged that the defendant subjected him to a "campaign of harassment" because he complained about alleged violations of federal and state law, internal company policies, and provisions of a collective bargaining agreement. *Id*. at 231-32. The case reached the California Supreme Court after the appellate court reversed a summary judgment decision in favor of the defendant. *Id*. at 231. In reviewing the appellate court's decision, the California Supreme Court engaged in a two-part analysis. First, it explained what an employee must plead and prove to establish a constructive discharge, and then analyzed whether the plaintiff had met his burden (Part II.A(1)(a)-(d) and Part II.B(1)). *See id*. at 226-30 & 231-33. Second, it detailed what this Court will refer to as the independent tort or contract requirement of a constructive discharge claim, and then analyzed whether the plaintiff had satisfied this requirement (Part II.A(2) and Part II.B(2)). *See id*. at 231 & 233-36.

Relevant to the pending motion is the second part of the analysis in *Turner*. As the California Supreme Court explained, "[s]tanding alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing." *Id*. at 231. Thus, "[e]ven after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for wrongful discharge." *Id*. For example, "[a]n actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee." *Id*. Like the present case, the plaintiff in *Turner* proceeded on the theory that his former employer violated a fundamental public policy. *See id*. at 233-34. The California Supreme Court rejected the plaintiff's

claim and reversed the appellate court, while emphasizing that the plaintiff's "failure to identify a statutory or constitutional policy that would be thwarted by his alleged discharge doom[ed] his cause of action." *Id*. at 234. The California Supreme Court added:

> [The plaintiff]'s vague charge of 'Alcohol, Tobacco and Firearms laws' violations, *largely unaccompanied by citations to specific statutory or constitutional provisions*, puts [the defendant] and the court in the position of having to guess at the nature of the public policies involved, if any. This kind of showing is plainly insufficient to create an issue of *material* fact justifying a trial on the merits of [the plaintiff]'s claims.

*Id*. (first emphasis added). Assuming *arguendo* that the plaintiff had identified company violations of state statutes implicating fundamental public policies, the California Supreme Court held that the plaintiff had "nonetheless fallen short of creating a triable issue on a cause of action for wrongful discharge in violation of fundamental public policy," noting, among other things, that the plaintiff had not shown "that he was ever asked to participate in any illegal activity or that he was subjected to harassment for performing a statutory obligation or exercising a statutory right or privilege," which meant that he could not "assert a wrongful discharge claim in the classic . . . sense." *Id*. at 235 (citations omitted).

In *Green* (also cited by Rentrak), the plaintiff filed a wrongful termination action against his former employer, a manufacturer of fuselage and wing components for civilian and military aircrafts, alleging that the employer terminated him in retaliation for his complaints about its inspection practices. 78 Cal. Rptr. 2d at 20-21. In its appeal to the California Supreme Court, the defendant relied on *Turner* for the proposition that the appellate court "erred in reversing its summary judgment motion because [the] plaintiff failed to identify a specific statute supporting his wrongful termination claim until he filed his opposition to defendant's motion." *Id*. at 26. The California Supreme Court

concluded that it did not need to decide "the precise time at which a plaintiff must identify the particular statute forming the basis of a [wrongful discharge] claim." *Id*. at 26 n.7. The California Supreme Court did, however, reaffirm the principle that a plaintiff must identify the statutory basis for his wrongful discharge claim in order to survive summary judgment: "Clearly, a claim that does not identify the basis of its wrongful termination allegations will not prevail on summary judgment." *Id*.

Burton maintains that Rentrak's reliance on *Turner* and *Green* is misplaced, as neither case indicates that a specific statutory, constitutional, or regulatory provision must be identified at the pleading stage. Burton draws the Court's attention to *Perez-Falcon v. Synargo West, LLC*, No. 1:11-cv-01645, 2011 WL 6752533 (E.D. Cal. Dec. 23, 2011). In *Perez-Falcon*, the defendant moved to dismiss its former employee's claim for wrongful termination in violation of public policy. *Id*. at *1-2. The former employee had generally alleged that she was terminated because she complained to supervisors about the company's failure to comply "with air quality regulations found in statutes" and "solid waste regulations found in statutes[.]" *Id*. The *Perez-Falcon* court interpreted one of the defendant's arguments as suggesting that the plaintiff must identify the *specific* laws or statutes allegedly violated by the defendant, in order to state a wrongful discharge claim. *Id*. at *3. The *Perez-Falcon* court rejected the defendant's argument, noting that (1) "[r]eporting 'illegal, unethical or unsafe practices' in the workplace is an activity protected by a fundamental public policy," (2) the defendant failed to cite, and the district court was unable to locate, controlling authority that supported the proposition that a specific law or statute must be identified at the pleading stage, (3) the plaintiff had generally tethered her claim to statutory authority, even though she did not specify the exact laws, statutes, or regulations she believed were violated by the defendant, which was

sufficient under the notice pleading requirements of Rule 8(a), and (4) the *Green* decision suggests that a plaintiff need not identify a particular law or statute "within the complaint or in discovery so long as the specific constitutional or statutory provisions embodying the applicable fundamental public policy bases for the claim are raised in opposition to a motion for summary judgment." *Id.* at *3-4.

Rentrak did not address or otherwise attempt to distinguish *Perez-Falcon* in its reply brief, and Rentrak has not identified any authority in support of its argument that a specific public policy must be identified at the pleading stage. *See* Mots. Hr'g Tr. 82, July 23, 2015 ("THE COURT: . . . [H]ave you found any cases where a court has dismissed a complaint on a 12(b)(6) motion, state or federal, because of failure to plead a specific public policy in this context? [RENTRAK'S COUNSEL]: No, I haven't, Your Honor."). Rather, Rentrak relies on *Turner* for its argument that the violation of an identified public policy is a prima facie element of a constructive discharge claim, and argues (without support) that Burton must identify the violated public policy at the pleading stage. The Court disagrees.

Consistent with *Turner* and recent caselaw from California federal district courts, this Court concludes that Burton has satisfied the notice pleading requirements. "Reporting 'illegal, unethical or unsafe practices' in the workplace is an activity protected by a fundamental public policy." *Perez-Falcon*, 2011 WL 6752533, at *3 (quoting *Collier v. Super. Ct.*, 279 Cal. Rptr. 453, 455 (1991)). These are the types of workplace practices that Burton claims to have reported to Rentrak. Among other examples, Burton alleges that, "[w]hile on drugs, [Giambra] drove Mr. Burton and [another Rentrak employee] to a [Twentieth] Century Fox meeting prompting [the other employee] to say that he would never again have Mr. Giambra drive him to a meeting as driving with Mr. Giambra was

simply dangerous." (Answer & Countercls. at 44-45.) Burton also alleges that, "[o]n one occasion, Mr. Giambra requested that Mr. Burton purchase Codeine for him in Australia because Codeine could be purchased over the counter in Australia unlike in the United States." (Answer & Countercls. at 45.) Burton reported Giambra's allegedly "erratic, illegal and abusive behavior, [and] frequent incapacitated state" to an external consultant retained by Rentrak, but Rentrak's senior management allegedly ignored Burton's complaints. (Answer & Countercls. at 47-49.) Burton believes that his confidential complaints were later leaked to Giambra, which precipitated Giambra's "successful attempt to leave Mr. Burton with no other reasonable choice but to end his employment with Rentrak[.]" (Answer & Countercls. at 52.) In light of these alleged facts, and in accordance with *Perez-Falcon*, the Court concludes that Burton has sufficiently pled a claim for constructive discharge under California law. *See also Vargas v. BP Am., Inc.*, No. 10-3130, 2011 WL 4433283, at *5 & n.12 (E.D. Cal. Sept. 21, 2011) (holding, in regard to the plaintiff's claim for termination in violation of public policy, "that notice pleading does not require [the] [p]laintiff to state in his complaint the statutory or regulatory basis of the claimed violation of public policy in order to survive a 12(b)(6) motion to dismiss," but also noting that, "in response to discovery, [the] plaintiff will have to spell out the statutes and regulations he relies on").[8]

## CONCLUSION

For the foregoing reasons, the Court recommends that the district judge grant Vista Group and Numero's motion to dismiss (ECF No. 6), grant Hedrick's motion to dismiss (ECF No. 12), deny

---

[8] Rentrak also argues that Burton's constructive discharge claim should be dismissed because he failed to plead that he was a member of a protected class, or that the harassment he alleges was linked to his membership in the protected class. The Court does not reach the question of whether Burton has adequately plead a hostile work environment claim, because Burton has pled adequately a constructive discharge claim based on his violation of public policy theory.

as moot Vista Group, Numero, and Hedrick's joint motion to strike (ECF No. 47), and deny Rentrak's motion to dismiss (ECF No. 27).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 28th day of September, 2015.

STACIE F. BECKERMAN
United States Magistrate Judge